**Affirmed and Majority and Dissenting Opinions filed March 29, 2022.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-20-00148-CV**

---

## ROBERTO ALONZO AND NEW PRIME, INC., Appellants

### V.

## CHRISTINE JOHN AND CHRISTOPHER LEWIS, Appellees

---

**On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 2014-44841**

---

### MAJORITY OPINION

Appellant Roberto Alonzo, while in the course and scope of employment for appellant New Prime, Inc., was driving a tractor-trailer on Interstate 45 when he rear-ended a sedan containing appellees Christine John and Christopher Lewis. Appellants conceded liability, and a jury awarded appellees more than $12 million in damages for physical pain and mental anguish. Appellants challenge the trial court's judgment in twelve issues, complaining about errors during voir dire and

closing argument, the admission of evidence, and the sufficiency of the evidence.[1] We affirm.

## I.    SUFFICIENCY OF THE EVIDENCE

We address appellants' complaints about the sufficiency of the evidence to support the damages awards before their other issues. *See, e.g.*, *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). In their sixth through eleventh issues, appellants contend that the evidence is legally and factually insufficient to support the jury's damages findings.[2]

## A.    Procedural Background

Appellants stipulated to liability. The first two jury questions asked what sum of money would fairly and reasonably compensate each plaintiff for their injuries. The question for John listed four potential elements of damages: past physical pain, future physical pain, past mental anguish, and future mental anguish. The question for Lewis asked only about past physical pain and past mental anguish. The jury answered unanimously as follows:

| **Question 1 – Christine John** | | **Question 2 – Christopher Lewis** | |
|---|---|---|---|
| Past physical pain: | $2,500,000 | Past physical pain: | $150,000 |
| Future physical pain: | $4,700,000 | Past mental anguish: | $300,000 |
| Past mental anguish: | $1,700,000 | | |
| Future mental anguish: | $3,100,000 | | |

The charge instructed the jury to consider only the elements of damages listed above, to not award any sum of money on any element if the jury had otherwise awarded a

---

[1] Appellants have not numbered their issues, but the "issues presented" section of their brief includes three broad categories with bulleted questions. We identify their issues by number as they appear sequentially in the bulleted questions.

[2] Although appellants refer to the different standards of review for legal and factual sufficiency, appellants do not analyze the legal and factual sufficiency points separately.

sum of money for the same loss under another element, and to not compensate the plaintiffs twice for the same loss.

The trial court signed a final judgment consistent with the jury's verdict. Appellants' motions for new trial and judgment notwithstanding the verdict were overruled by operation of law.

**B.      Standards of Review for Sufficiency Challenges**

For a legal sufficiency challenge, we review the record in the light most favorable to the jury's verdict, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We indulge every reasonable inference in support of the verdict. *Id.* at 822. We may not substitute our opinions on credibility for those of the fact-finder. *See id.* at 816–17, 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

In a factual sufficiency review, we will set aside the verdict and remand for a new trial if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (citing *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951)). We will weigh the evidence supporting the verdict along with evidence contrary to the verdict. *See id.* at 761–62. However, the fact-finder remains the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.* at 761. We must defer to the fact-finder's determinations so long as those determinations are reasonable. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). We may not merely substitute our judgment for that of the fact-finder. *Golden Eagle Archery*, 116 S.W.3d at 761. The amount of

3

evidence necessary to affirm the judgment is far less than the amount necessary to reverse. *Harris Cnty. v. Coats*, 607 S.W.3d 359, 381 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

## C.     General Principles for Pain and Mental Anguish Damages

Under Texas law, "whether to award damages and how much is uniquely within the factfinder's discretion." *Golden Eagle Archery*, 116 S.W.3d at 772. The jury has broad discretion to award damages within the range of the evidence presented at trial. *Critical Path Res., Inc. v. Cuevas*, 561 S.W.3d 523, 561 (Tex. App.—Houston [14th Dist.] 2018, pet. granted, judgm't vacated w.r.m.). Damages associated with physical injuries are "not subject to precise mathematical calculation" because physical pain and mental anguish are inherently subjective. *Richards v. Tebbe*, No. 14-13-00413-CV, 2014 WL 2936425, at *5 (Tex. App.— Houston [14th Dist.] June 26, 2014, no pet.) (mem. op.) (quoting *Weidner v. Sanchez*, 14 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see also PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 518 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("The process of awarding damages for amorphous, discretionary injuries such as physical pain and mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss.").

"Pain and suffering may be inferred or presumed as a consequence of severe injuries." *Id.* at 574. Although mental anguish cannot be inferred from any physical injury, it may be inferred as a natural consequence of severe physical injury. *See Ontiveroas v. Lozano*, No. 14-05-00294-CV, 2006 WL 1140374, at *2 (Tex. App.— Houston [14th Dist.] Apr. 27, 2006, no pet.) (mem. op.); *see also Parkway Co v. Woodruff*, 901 S.W.2d 434, 442, 445 (Tex. 1995) (noting that a threat to one's physical safety may justify an inference of mental anguish, and historically, if there was physical injury resulting from physical impact, "recovery of mental anguish

4

damages was not hard to justify"). "Although the fact of a physical injury does not alone support an award for mental anguish damages, we can consider the traumatic nature of an injury as a factor in deciding whether the award is supported by the evidence." *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 595 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

Mental anguish is only compensable if it causes a 'substantial disruption in daily routine or a high degree of mental pain and distress. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). Thus, mental anguish damages cannot be awarded without either (1) direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine; or (2) other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). The absence of direct evidence justifies close scrutiny of other evidence of mental anguish damages. *Favalora*, 476 S.W.3d at 594 (citing *Parkway*, 901 S.W.2d at 444).

Damages for future physical pain are recoverable if a jury could reasonably infer that the plaintiff will feel physical pain in the future. *PNS Stores*, 484 S.W.3d at 517. Similarly, damages for future mental anguish are recoverable if there is a reasonable probability that the plaintiff will suffer compensable mental anguish in the future. *Id.*

**D.     Evidence and Analysis of Christine John's Past and Future Physical Pain**

In appellants' seventh and eighth issues, they contend that the evidence is legally and factually insufficient to support the jury's damages award to John for past and future physical pain, respectively $2.5 million and $4.7 million. Appellants concede that John suffered physical pain after the accident and still had pain at the time of trial. But appellants contend that the jury's awards are excessive, and

5

appellants ask this court to reverse and remand for a new trial or suggest a remittitur. Accordingly, we address their issues as a factual-sufficiency challenge. *See Critical Path*, 561 S.W.3d at 561 ("When a party argues on appeal that the damages awarded by the jury are excessive we review the evidence for factual sufficiency.").

John was twenty-four years old in September 2012. She was driving a Nissan Sentra on Interstate 45 when appellants' tractor-trailer rear-ended her and pushed her into another vehicle. She hit her head during the accident and was taken to a hospital where she complained of head and neck pain. An MRI showed bulging and herniated discs in her spine. Her treating neurosurgeon testified that these conditions caused pain and that a herniated disc "doesn't go back in" and "doesn't go back to normal," which may cause lingering pain over time.

Within two weeks of the accident, she also started to feel sharp pain on the left side of her face that radiated from her ear to her lower jaw. She reported to one of her treating neurologists that the pain was a "10 out of 10," or the worst possible pain. It is a sharp and severe pain that occurs in bursts throughout the day. It can be triggered by touching her face, a cool temperature, cold air hitting her face, brushing her teeth, or talking, among other things. Multiple doctors—neurologists and neurosurgeons—diagnosed John with an uncommon condition known as "trigeminal neuralgia," meaning a damaged nerve in her face. The doctors opined that facial trauma from the accident caused the nerve damage.

The doctors described trigeminal neuralgia as a "very painful" syndrome: "probably the most excruciating pain you can imagine and—and that's kind of running down your entire face." It is one of the most painful conditions known to medicine, and it is "well known that it is a horrible pain." The doctors were aware it had been called "the suicide disease" because "so many people couldn't handle the— the pain."

6

Doctors attempted to treat John's pain with medications, but the pain continued. Some medication had side effects, like making her vomit. She underwent a "gamma knife" radio surgery that involves using radiation to destroy part of the nerve. She noticed some improvement, but the pain merely "lagged," i.e., instead of occurring immediately after a triggering event, the pain would come ten or fifteen minutes later. The doctors described other potential invasive surgeries that could lead to total loss of feeling in John's face or implanting an electrode that is attached to a battery that sends electrical signals to the nerve.

John testified that her pain continued at trial: "I am in pain right now." She described it as a "10 out of 10." She lives with pain all day, every day. Although not constant, she has episodes throughout the day. She continued to have lower back pain depending on what she does, but "it's not anything like the face." A doctor testified that no treatments for trigeminal neuralgia are guaranteed to relieve the pain and prevent it from recurring. Episodes of pain often worsen over time with fewer and shorter pain-free periods before recurring. Eventually, pain-free intervals disappear. It is more likely than not that symptoms of trigeminal neuralgia may affect the patient for the rest of her life. John had a life expectancy of fifty-one more years.

Appellants, contending that the jury's damages awards are excessive, point to evidence that John did not request damages for medical expenses or lost wages, refused certain treatment such as medications, and continues to work and "live her life." The jury, as the sole judge of the witnesses and their credibility, could have considered this evidence in exercising its broad discretion to determine the amount of compensation due to John for her past and future physical pain. The fact that John stopped taking medications that were not effective to reduce her pain or had side effects, or that future medical treatment was not guaranteed, does not negate the

jury's finding of future physical pain. *See Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 761 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Appellants point to other cases from Texas and outside Texas in which juries awarded lower damages for allegedly "worse pain and suffering" or comparable injuries.[3] Many cases have distinguishing facts.[4] Although we may review verdicts in other cases to determine the reasonableness of compensation, each case must be evaluated on its own facts, and often "comparison of injuries in different cases is virtually impossible." *Critical Path*, 561 S.W.3d at 570 (quotation omitted); *see also Primoris Energy*, 569 S.W.3d at 760 ("[C]omparison with other cases or amounts of verdicts is generally of little or no help." (quotation omitted)); *Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 845 & n.19 (Tex. App.—Fort Worth 2018) ("Because the appropriateness of an award in a case turns on the specific facts of that case, referencing the amounts awarded in other cases is of limited help to a court reviewing the sufficiency of the evidence to support an award."), *aff'd*, 627 S.W.3d 197 (Tex. 2021). Moreover, comparison to other cases does not necessarily show that the jury's award is excessive. *See Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551–53 (Tex. App.—Fort Worth 2006, pet. dism'd) (upholding jury's verdict for

---

[3] *See, e.g., PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 517–18 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Gulf-Inland, LLC v. Jackson*, No. 01-10-01025-CV, 2012 WL 1454476, at *9–11 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.); *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165–67 (Tex. App.—Eastland 2009, pet. dism'd).

[4] For example, in *Gulf Inland*, the plaintiff suffered intense pain near the time of the accident but then had "on and off" pain that was "mild and occasional" following surgery. *See* 2012 WL 1454476, at *9. The evidence supported an award of $1.5 million in past and future physical pain and mental anguish. *See id.* In *PNS Stores*, the plaintiff suffered a concussion from being struck by several thirty-two-ounce bottles of deck wash that fell five feet from a shelf. *See PNS Stores*, 484 S.W.3d at 508–09. He suffered headaches, ringing in his ears, severe pain in an eye upon exposure to light, and soreness and stiffness in his neck and shoulder. *Id.* at 518. The evidence supported an award of $670,000 for past and future physical pain and mental anguish. *See id.* at 517–18.

$15 million in damages for past and future physical pain and mental anguish when plaintiff suffered brain damage, had trouble walking, and was depressed).

Considering all of the evidence, we cannot conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. The evidence is factually sufficient. We overrule appellants' seventh and eighth issues.

### E. Evidence and Analysis of Christine John's Past and Future Mental Anguish

In appellant's ninth and tenth issues, they contend there is no evidence, or insufficient evidence, to support the jury's damages award to John for past and future mental anguish, respectively $1.7 million and $3.1 million. Appellants contend that John presented no evidence about her mental anguish—only about her physical pain.

Appellants contend, and we agree, that because the jury was asked to award damages separately for pain and mental anguish, evidence of John's physical pain alone cannot support the award for mental anguish. *See Favalora*, 476 S.W.3d at 595–96 (noting that a jury "cannot automatically infer mental anguish once any physical injury is sustained," and that evidence related to the plaintiff's physical pain was "not relevant to the jury's award of mental anguish" damages because the jury provided separate awards for physical pain and mental anguish). But because John testified about her awareness and the extent of her physical pain, we cannot ignore that evidence when considering the nature of her injury and the mental anguish that may derive from a threat of physical pain. *See id.* (noting jury may consider the nature of an injury as a factor in deciding whether mental anguish damages are supported by the evidence); *Ontiveroas v. Lozano*, No. 14-05-00294-CV, 2006 WL 1140374, at *2 (Tex. App.—Houston [14th Dist.] Apr. 27, 2006, no pet.) (mem. op.) (noting that fear of imminent serious injury "even for a matter of seconds, provides

9

some evidence of mental anguish that is more than mere worry, anxiety, vexation or anger"); *see also Golden Eagle Archery*, 116 S.W.3d at 773 ("[I]n reviewing a challenge that an award [of damages] for a category is excessive because there is factually insufficient evidence to support it, a court of appeals should consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages.").

Appellants point to evidence that John continues to work and is successful in her career, has "the right attitude," pushes through the pain, has not "given up," is "still living life," and is not on antidepressants. But, there is other direct evidence of John's high degree of mental pain and distress and a substantial disruption of her daily life.

John testified that her injury is sometimes debilitating and she "can't take it." Sometimes she has to "ball up in a ball and just lay down and just wait" with the lights turned off. If she has an episode while driving, she has to pull over to wait until it subsides. She likes to sleep a lot because when she is asleep, she doesn't feel the pain. She goes to bed as early as possible to make the pain stop. She is sad a lot because she cannot do all the things that she used to be able to do or that she wants to do. She does not go out like she used to before the accident. She has a less active intimate relationship with her husband, Lewis. He testified that they began to sleep in separate beds after the accident so there is no inadvertent contact that will trigger her pain. He testified similarly that, ever since the accident, they "really don't do anything"; they just stay at home, although they were active people before the accident.

John testified that she is angry and upset because she doesn't know what to do or how to fix her injury, and she cannot avoid things that she must do that cause pain, such as talking, eating, or brushing her teeth. She is terrified by the prospect of

future surgeries, the potential for becoming numb, having something drilled into her head, and a battery pack in her chest for the rest of her life. Lewis testified that John's mood changes when she has an episode—she feels down. He testified, "She gets really emotional at times, and I think it's just a buildup of the pain and just emotional anguish and things like that. And she can have an episode of crying just out of anywhere." John testified that she contemplated suicide because "it hurts so much."

Testimony from John and Lewis shows that John has suffered a high degree of mental pain and distress and a substantial disruption of her daily life. *Cf. Serv. Corp. Int'l. v. Guerra*, 348 S.W.3d 221, 233 (Tex. 2011) (holding that evidence was sufficient to support jury's award of $2 million in past mental anguish damages although there was no evidence of a substantial disruption of daily routine, and there was evidence that the plaintiff volunteered at a nursing home, participated in visitation with her church, worked in the church kitchen, and traveled occasionally). Appellant's reliance on *Bentley v. Bunton*, a defamation case in which the Texas Supreme Court held a public figure could recover mental anguish damages, is not persuasive. *See* 94 S.W.3d 561, 605 (Tex. 2002). The supreme court held there was legally sufficient evidence of some amount of compensable mental anguish damages, but the evidence did not support the $7 million award because it was "excessive and unreasonable." *Id.* at 606–07. The policy implications relied upon by the court regarding defamation cases, and the nature of the case and particular evidence involved, distinguish it from the evidence here involving a significant physical injury. *See id.* at 605–07.

Evidence discussed above—including John's testimony about her present condition and the doctors' testimony about the lack of effective treatment and potential worsening of the condition over time—shows with reasonable probability that she will suffer compensable mental anguish in the future. *See PNS Stores*, 484

11

S.W.3d at 517; *see also Patel v. Hussain*, 485 S.W.3d 153, 183 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (factually sufficient evidence of future mental anguish damages because "the circumstances that produced at least some of the previous mental anguish are likely to recur" (quotation omitted)).

The evidence is legally and factually sufficient to support the jury's award of past and future mental anguish damages to John. We overrule appellants' ninth and tenth issues.

## F.     Evidence and Analysis of Christopher Lewis's Past Physical Pain

As part of their eleventh issue, appellants contend that the evidence is legally and factually insufficient to support the jury's award of $150,000 to Lewis for his past physical pain. Appellants focus on Lewis's testimony that he was "doing okay" and "fine" by the time of trial and that pain management has "helped a lot."

Other evidence, however, supports the jury's finding of damages for past physical pain. Lewis was a passenger in the vehicle when it was struck. His airbag deployed, and he went to the hospital. His medical records indicated that he reported pain on the top of his head, back, and neck. He described his pain as continuous aching and rated it a five out of ten. Lewis's treating neurosurgeon testified that Lewis came to him with lower back pain and neck pain. Lewis claimed that his back pain had started since the accident and was a "stabbing, tingling, dull, and constant" pain. Lewis rated it as a seven out of ten. Over the years, Lewis took medications and underwent physical therapy and chiropractic treatments before seeing the neurosurgeon. Lewis was diagnosed with spinal stenosis in his neck and back and a bulging disc in the lumbar spine and radiculopathy in the lumbar and cervical region—meaning there was something pushing on a nerve root that runs down from the spine to Lewis's arms and legs. Lewis underwent epidural steroid injections. Lewis testified that his back and neck were "really hurting" for the first couple of

12

years following the accident, but he does "injections now, and that has helped me a lot." The neurosurgeon testified that the types of injuries Lewis suffered are "absolutely" painful.

Considering all of the evidence, it is legally and factually sufficient to support the jury's award of damages to Lewis for past physical pain.

## G. Evidence and Analysis of Christopher Lewis's Past Mental Anguish

Also part of their eleventh issue, appellants contend that the evidence is legally and factually insufficient to support the jury's award of $300,000 to Lewis for his past mental anguish.

A damages award for mental anguish will survive a legal-sufficiency challenge when the record bears "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in the plaintiff['s] daily routine," or when the record demonstrates "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Anderson v. Durant*, 550 S.W.3d 605, 619 (Tex. 2018) (quoting *Parkway Co*, 901 S.W.2d at 444). Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co.*, 901 S.W.2d at 444.

Appellants assert there is no evidence of the nature, duration, or severity of Lewis's mental anguish, and there is no evidence that Lewis suffered from a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger to support the award of past mental anguish damages.

We have determined that John's mental anguish damages are supported by sufficient evidence in that John suffered from debilitating pain described by experts

13

as "the suicide disease" because "so many people couldn't handle the—the pain." The record reflects that John has no way to predict when her extreme pain will occur, but that it can be triggered by the touching of her face, cool temperatures, brushing her teeth, or talking. Lewis testified that he and John frequently cannot sleep in the same bed or even the same room because Lewis is afraid that the temperature of the room will cause John severe pain, or he might accidentally touch John during the night causing her extreme pain. Lewis's testimony about his life with John since the accident reflects a substantial disruption in Lewis's daily routine coupled with mental pain and distress beyond mere worry, anxiety, vexation, embarrassment, or anger.

Before the accident John and Lewis enjoyed playing sports and attending active activities together such as basketball and swimming. After the accident John was unable to participate in any activity or exertion without pain. Lewis further testified that "this illness affects our intimacy" causing difficulty being "passionate and affectionate[.]"

As to how the accident affected him directly, the record reflects that two weeks after the accident Lewis completed a "Symptoms and Functional Outcomes Assessment." In that assessment, when asked whether his pain interfered with his ability to see the people who were important to him as much as he liked, Lewis circled "9" on a scale of one to ten with ten being described as "total interference." Lewis further stated that he needed help all the time to complete everyday tasks and that he felt more depressed, tense, or anxious than before his pain began. Lewis stated that he had severe emotional problems caused by his pain that interfered with family, social, and/or work activities.

Appellants assert that John frequently "does things with his friends," plays in a band, and is doing well in his career. To be sure, Lewis began his testimony

14

explaining that he was "doing fine" and was not asking for future damages. Lewis's coping mechanisms since the accident do not detract from the fact that he lived daily with his spouse's extreme pain and mental distress. He testified that he "has to live with [John's] injuries and everything that she has to go through." Lewis testified that while he considered John to be a "modest, very humble lady," in watching her endure severe pain, he also "[felt] some of the pain."

The record reflects sufficient evidence that the accident created a substantial disruption of Lewis's daily routine and a high degree of mental distress. *See Favalora*, 476 S.W.3d at 597 ("The jury could have inferred from Favalora's attitudinal changes and the attendant hardships that Favalora had suffered a high degree of mental pain and distress beyond mere worry, vexation, embarrassment, or anger."). Not only did Lewis experience mental anguish as a result of his own injuries, but he also experienced mental anguish living with John and doing everything he could to help her avoid severe physical and emotional pain.

Considering all of the evidence, it is legally and factually sufficient to support the jury's award of damages to Lewis for past mental anguish. We overrule appellants' eleventh issue.

## H. Cumulative Awards

In their sixth issue, appellants contend the jury's awards are "far greater than any award ever sustained in Texas for comparable injuries and without supporting evidence." Appellants do not brief this issue separately from their sufficiency challenges, but they contend in their briefing that John's cumulative awards for physical pain and mental anguish "are excessive, are a result of the jury's passion and prejudice spurred by counsel's comments, and are entirely disproportionate to the economic damages she allegedly sustained." Appellants ask this court to consider appellees' responses to requests for disclosures in the Clerk's Record, in which

appellees alleged John's past and future medical expenses would amount to only $493,938.73 on the high end.[5] Appellants contend that the ratio of about 24:1 between noneconomic and economic damages shows that the jury's award is excessive.

Appellants cite no case from this court endorsing the ratio analysis, and as another court of appeals has suggested, the ratio analysis is typically used for evaluating constitutional limitations imposed on punitive damages and defamation claims. *See Emerson Elec. Co*, 601 S.W.3d at 844 n.18. That court concluded it need not consider the proportionality of economic and noneconomic awards when some evidence supports the award. *See id.* at 844; *see also PNS Stores*, 484 S.W.3d at 519–20 (rejecting claim that noneconomic damages were excessive because they were fifty-eight times the amount of medical expenses).

In the only personal injury case relied upon by appellants that reversed a jury's verdict based in part on the ratio of economic and noneconomic damages, the evidence of pain and mental anguish was far weaker than here; and improper arguments also undermined the verdict. *See FTS Int'l Servs., LLC v. Patterson*, No. 12-19-00040-CV, 2020 WL 5047913, at *13–26 (Tex. App.—Tyler Aug. 26, 2020, pet. filed) (mem. op.) (considering the car accident was a minor impact collision that caused only cervical herniation, the plaintiff presented inconsistent, equivocal, contested, and sparse evidence to support $24 million in noneconomic damages, and counsel engaged in misconduct, made improper accusations of spoliation, and told the jury to punish the defendant and send a message).

Even if the proportionality of economic and noneconomic damages suggests the verdict could be excessive, the specific evidence presented in this case regarding

---

[5] Appellants omit from this number John's alleged lost future wages of $595,290 to $2.3 million.

John's physical pain and mental anguish, discussed above, supports the jury's verdict. *See PNS Stores*, 484 S.W.3d at 519–20 ("Moreover, because there was evidence to account for the jury's large verdict, we cannot say that the verdict was so flagrantly excessive that it cannot be accounted for on any other ground.") (quotation omitted)). Even if some of counsel's comments to the jury were improper, as discussed below, they were not such to impact the jury's award. Finally, we note that the jury awarded "different claimants different amounts for different categories of non-economic damages," which "demonstrates careful consideration of what amounts to assess." *See Gregory*, 615 S.W.3d at 277; *cf. Critical Path*, 561 S.W.3d at 577 (suggesting remittitur for excessive noneconomic damages when the jury "picked a final amount of $10,000,000 for each parent's damages, divided that total by the number of damage blanks in the jury charge, and then filled in the same amount of damages in each blank.").

We will not substitute our judgment for that of the jury's when the evidence supports an award for significant physical pain and mental anguish. We overrule appellant's sixth issue.

## II.     CONDUCT OF COUNSEL

In their first five issues, appellants complain of individualized and cumulative error related to the conduct of appellees' counsel during voir dire and closing arguments.

### A.     Jury Selection

In their first issue, appellants contend that the trial court erroneously allowed appellees to ask improper commitment questions about whether the venirepersons could award $10 to $12 million in damages. In their second issue, appellants contend

17

that the trial court erroneously struck two potential jurors for cause because they could not commit to award damages within that range.

## 1. Background

Early during voir dire, appellees' counsel informed the venirepersons that appellees were suing for $10 to $12 million in damages for mental anguish and pain and suffering. While questioning venirepersons about their potential biases, counsel sometimes asked the venirepersons if they had biases against awarding "millions of dollars" based on intangible personal injuries. Sometimes, however, counsel referred to the more specific range of $10 to $12 million. For example:

> And so, here's what I'm getting at. A concern—and I'm not going to tell you about any evidence. I am asking you, hypothetically speaking, can you consider a situation where you could award someone 10 to 12 million dollars in mental anguish and pain and suffering?

When a venireperson said they could not consider awarding millions of dollars in pain and suffering and mental anguish, regardless of the law and regardless of whether it was supported by the evidence, the trial court interrupted "to just clarify a couple of things." The court explained:

> So, we're talking about if you are—obviously, you haven't heard any evidence. So—and you're not being asked to make that decision here. And at the end of this case, the Court is going to give you a jury charge where I'm going to ask you some questions; and some of those questions might ask you to provide for a dollar amount for certain types of damages.

> But the primary concern is not having heard any evidence, have you already decided that you've already set a limit? You categorically will not award such-and-such amount because you don't believe there can ever be a case where such an amount can be proved to you and so that you're—you're not the right person for this jury.

> And so, I just want to kind of reframe it a little bit, because I don't want there to be any misunderstanding that you're not being asked

to decide right here and now whether or not you can award any sum of money, because you're not. You're just being asked whether or not you've decided before you've heard any evidence what you can and can't do.

Appellants "object[ed] to this continuing line of questioning as a commitment to the jury, even though it's a range."

Many of the venirepersons expressed a bias against awarding "millions of dollars" for pain and suffering and mental anguish. When one venireperson expressed this bias, appellees' counsel asked if anyone felt similar. Juror No. 14 answered:

> Venireperson: Right. I think corporations can be big targets sometimes; and I think there's a broad line between physically debilitating injuries, loss of life, can't work a job, and mental anguish. I just—I can't see how you could award that much money for mental anguish.

*****

> [Counsel]: Right. And could you think of a hypothetical situation not in this case but hypothetically where you could consider awarding 10 to 12 million dollars?

> Venireperson: Not that much.

> [Counsel]: Regardless of the evidence?

> Venireperson: Yeah.

*****

> [Counsel]: Is anything changed? This is—as we discussed, this is probably not the best case for you?

> Venireperson: Just I have trouble with the dollar amount and the pain and suffering.

> [Counsel]: Right.

> Venireperson: I know it can be that she has valid concerns, but the dollar amount just bothers me.

[Counsel]: And even setting aside the dollar amount—I think you shared that the noneconomic, the mental anguish and pain and suffering, is something that you struggle with?

Venireperson: To a degree, yes.

[Counsel]: Right. Such that you would have a bias in the case?

Venireperson: Right. Maybe I would keep an open mind; but I would always have that seed, you know, what's the goal here.

Appellants' counsel returned to Juror No. 14 during voir dire and asked several follow-up questions:

[Counsel]: Can you listen to the evidence that is from the witness stand or the evidence that's admitted and consider the evidence and award damages as proved?

Venireperson: If the facts prove it, then yes.

[Counsel]: Whether or not it's a hundred dollars or $12 million, you can do that?

Venireperson: Yes.

When several other jurors expressed their biases "in a case like this where one side is suing another side for millions of dollars in mental anguish and pain and suffering," appellees' counsel asked, "Anybody else?" Juror No. 48 spoke up:

[Counsel]: Venireperson: I can't imagine any case, pain and suffering inside, that would go up to 10 and 12 million dollars, minus your fee of maybe 5 million. I think something 5 million would support somebody with psychiatrist, medication, everything for the hospital. It's just a little bit too much, even if they couldn't work for the rest of their life.

[Counsel]: Okay. All right. Would you have—is that a cap you have in your mind?

Venireperson: Yes, because I'm retired; and I know what it cost to live on your own moneys without any help. And I think that's a little too far.

[Counsel]: Sure. Would you have a bias in a case like this that you could not consider more than the cap in your predetermined mind?

20

Venireperson: More than what?

[Counsel]: Than the 5 million, even if the evidence supports it, regardless of the Court's instructions?

Venireperson: She's sitting out in the hallway, right?

[Counsel]: Yes.

Venireperson: I can't go along with that.

[Counsel]: Okay. And may I dot my Is and cross my Ts? Would you have a bias in a case like this where one side is suing another side for millions of dollars in mental anguish—

Venireperson: Millions, no. If you have like 1 million or 2 million, 3 million; but when you're getting up to 5 million for somebody who is physically fine now with pain and injury and—that's a little too much.

[Counsel]: Okay.

Venireperson: I know the cost of living with pain and injury.

[Counsel]: Okay. And I'm expressing to you that it has nothing to do with the cost of living, whether she works or not. It's just internally, putting a value on—

Venireperson: Even internally.

Appellants' counsel moved to strike for cause twelve venirepersons, and the court struck all of them.[6] Appellees' counsel moved to strike for cause Jurors No. 14 and 48, among others, and the court struck them. Appellants' counsel complained that Jurors No. 14 and 48 and two others "didn't even come close to reaching a level which would be grounds for striking for cause," and that by striking those venirepersons, the court was "giving [appellees] four extra peremptory challenges." As a "way to preserve" error, appellants' counsel asked for four additional peremptory challenges. The court denied the request, explaining:

> Based on the Court's review of their demeanor, of the totality of the circumstances over the record, having visually observed each of these folks and the way they answered their questions and based on their

---

[6] One of the venirepersons, Juror No. 22, was excused for a reason other than for cause.

21

responses, the Court believes that the ones that are relieved for strikes for cause were—exhibited bias or prejudice.

When the court announced the names of the twelve jurors, plus an alternate, the court asked if there were any objections before swearing in the jury. Appellants' counsel answered, "No."

### 2. *Legal Principles*

Voir dire protects the right to an impartial jury by exposing possible improper juror biases that form the basis for statutory disqualification. *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 749 (Tex. 2006). "Thus, the primary purpose of voir dire is to inquire about specific views that would prevent or substantially impair jurors from performing their duty in accordance with their instructions and oath." *Id.* Inquiry into potential jurors' bias and prejudice is proper to determine not only whether jurors are disqualified by statute, but also to seek information that allows counsel to intelligently exercise their peremptory strikes. *Id.* at 750.

However, most types of "commitment" questions are improper. A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning of a particular fact. *K.J. v. USA Water Polo Inc.*, 383 S.W.3d 593, 601 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "Questions that are not intended to discover bias against the law or prejudice for or against the defendant, but rather seek only to determine how jurors would respond to the anticipated evidence and commit them to a specific verdict based on that evidence are not proper." *Id.* (citing *Vasquez*, 189 S.W.3d at 753).

Trial courts should allow "broad latitude" for counsel to discover any bias or prejudice. *Vasquez*, 189 S.W.3d at 749. And trial courts have "broad discretion" in conducting voir dire. *Id.* at 753. Generally, we review a trial court's decision regarding what questions may be asked and the court's striking a juror for cause

22

under an abuse-of-discretion standard. *See K.J.*, 383 S.W.3d at (trial court's refusal to allow certain question reviewed for abuse of discretion); *Taber v. Roush*, 316 S.W.3d 139, 163–64 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (trial court's refusal to strike a juror for cause reviewed for abuse of discretion). Even if a juror's bias or prejudice is not established as a matter of law, the trial court may make a factual determination about whether the venireperson should be disqualified. *See Malone v. Foster*, 977 S.W.2d 562, 564 (Tex. 1998) (citing *Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex. 1963) (noting that the trial court is in a better position than an appellate court to evaluate a juror's sincerity and capacity for fairness and impartiality)).

### 3. *No Error*

Appellants cite no case in which the trial court erred by allowing certain questions or striking a juror for cause. Appellants rely on *K.J. v. USA Water Polo, Inc.*, in which this court affirmed the trial court's *refusal* to allow the question of whether the venirepersons "would be willing to award damages to [the plaintiff] of $2 million if the law and credible evidence justified such an award." 383 S.W.3d at 601. This court relied on the considerable discretion afforded trial courts in conducting voir dire to hold that the court did not abuse its discretion in disallowing the question because it was "framed as a preview of the claims involved," regardless of "[w]hether appellants' question exactly fits the definition of a commitment question." *Id.* at 602.

Here, appellees' counsel's questions to the jury regarding their willingness or ability to award "millions of dollars" or "10 to 12 million dollars" in non-economic damages did not preview any specific fact or evidence for the jury. The questions were phrased repeatedly as hypothetical questions. As the trial court clarified to the jury, the questions were not intended to have the venirepersons make decisions

23

before hearing evidence, but to determine whether any jurors had "set a limit" in their minds so they couldn't ever award such an amount: "You're just being asked whether or not you've decided before you've heard any evidence what you can and can't do." Under these circumstances, appellees' counsel's questions do not "exactly fit[] the definition of a commitment question," and we cannot hold that the trial court abused its considerable discretion in the area of voir dire. *Cf. K.J.*, 383 S.W.3d at 601–02.

In *Taber v. Roush*, also relied upon by appellants, the plaintiff's counsel asked, "Who feels . . . that under no circumstances, no matter what the evidence is, could you ever award a million dollars or more for mental anguish in a case?" 316 S.W.3d at 164. A venireperson raised his hand in response to the question. *Id.* But, the plaintiff's counsel asked no follow-up questions, and the venireperson had already indicated that he could award mental anguish damages, follow the instructions of the court, and consider the evidence in determining whether to award mental anguish damages. *Id.* at 164–65. This court noted, "Bias is not established as a matter of law merely because venire members raise their hands in response to a general question addressed to the entire panel." *Id.* at 165. This court held that the trial court did not abuse its discretion by denying a challenge for cause. *Id.* Here, on the other hand, the record shows detailed questioning of Jurors No. 14 and 48 to discover potential bias.

An apt precedent is this court's holding in *Cavnar v. Quality Control Parking, Inc.*, 678 S.W.2d 548, 555–56 (Tex. App.—Houston [14th Dist.] 1984), *rev'd in part on other grounds*, 696 S.W.2d 549 (Tex. 1985). This court held that the trial court did not abuse its discretion by striking a venireperson for cause when he "indicated that he could not consider $1,000,000 as damages for loss of companionship and mental anguish." *Id.* at 555–56. This court reasoned that the venireperson "expressed

a bias against awarding nonpecuniary damages supported by the evidence." *Id.* at 555.

Here, Juror No. 14, before being rehabilitated by appellants' counsel, said he could not award $10 to $12 million in mental anguish and pain and suffering "regardless of the evidence," and he couldn't think of any hypothetical situation in which to award that much money. He agreed that he had "a bias in the case." Similarly, Juror No. 48 said she couldn't "imagine any case" in which to award more than $5 million in pain and suffering. She agreed that $5 million was a "cap" in her mind.

Even if the record does not show that these venirepersons were disqualified as a matter of law, we must defer to the trial court's factual determinations based on personal assessment of the venirepersons' sincerity and capacity for fairness and impartiality. *See Malone*, 977 S.W.2d at 564; *see also Greenwood Motor Lines, Inc. v. Bush*, No. 05-14-01148-CV, 2017 WL 1550035, at *3 (Tex. App.—Dallas Apr. 28, 2017, pet. denied) (mem. op.) (holding that trial court did not abuse its discretion striking jurors for cause who said they would place their own "cap" on damages "regardless of the evidence"). As the trial court orally announced, the court based its determination on visually observing the venirepersons and their demeanors.

In sum, the trial court did not abuse its discretion in allowing appellees' counsel to ask the venirepersons about their ability or willingness to award $10 to $12 million in damages and in striking two venirepersons who expressed bias against awarding damages regardless of the evidence.

### 4. *No Harm Regarding Strikes*

Even if we assume the trial court erred by striking Jurors No. 14 and 48, to show harm from the erroneous striking of venirepersons for cause, appellants must

show that an objectionable juror was impaneled. *Cavnar*, 678 S.W.2d at 556; *see also Greenwood Motor Lines*, 2017 WL 1550035, at *3 ("Even if challenges for cause are improperly sustained, no reversible error is presented unless appellant can show he or she was denied a trial by a fair and impartial jury."). Because the trial court did not seat on the jury any of the venirepersons to which appellants objected, and appellants had no objection to the jurors actually impaneled, appellants have not shown that any error from striking Jurors No. 14 and 48 caused harm warranting a new trial. *See Greenwood Motor Lines*, 2017 WL 1550035, at *3; *Cavnar*, 678 S.W.2d at 556. We overrule appellants' first and second issues.

## B. Arguments of Counsel

In their third through fifth issues, appellants contend they are entitled to a new trial because the trial court permitted improper and incurable arguments from appellees' counsel. After reviewing legal principles related to arguments of counsel, we address each issue in turn.

### 1. *Legal Principles*

Error regarding improper jury argument ordinarily must be preserved by a timely objection that is overruled. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). A party waives error by not following up a sustained objection with a request for an instruction to disregard. *Barras v. Monsanto Co.*, 831 S.W.2d 859, 865 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840–41 (Tex. 1979)). Typically, retraction of the argument or an instruction from the court can cure any probable harm. *Penalver*, 256 S.W.3d at 680.

However, in "rare instances," the probable harm or prejudice cannot be cured, and a complaint may be made even though no objection was timely made. *Id.* "To

26

prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." *Id.* at 680–81. The party must show that, based on the record as a whole, "the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (quotation omitted). We consider the argument in light of the whole case. *Haryanto v. Saeed*, 860 S.W.2d 913, 919 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (citing *Reese*, 584 S.W.2d at 839).

An argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful. *Penalver*, 256 S.W.3d at 681. Examples of incurable arguments include (1) appeals to racial prejudice; (2) unsupported, extreme, and personal attacks on opposing parties and witnesses; and (3) unsupported accusations of the opposing party manipulating a witness. *See id.*

## 2. *Race and Gender*

In their third issue, appellants contend that appellees' counsel made "improper and prejudicial jury arguments [that] clearly accuse Appellants and their counsel of race and gender prejudice."

During voir dire, one of the venirepersons referred to her prior experience in a lawsuit when she trained a man for a job who "ended up making three times more" than her. Appellees' counsel responded, "Well, it's funny you bring that up because on my fear list—on my fear list that I write before I talk to every jury panel, I have on here there are studies where woman are awarded for the same injuries less money than men." Later, counsel asked a venireperson, "I mean, because it goes back to

27

what we talked about, you know, like a woman—there's studies that show a woman—her damages are usually less than a man for the same injuries, and sometimes it's like if someone is—does it matter if my client is African-American?"

Appellees' counsel circled back to this topic during closing arguments: "We don't want their 4 or 5 million dollars. That's not fair. Because it's a woman, she should get less money? Because she's African American, she should get less money? No. We're going to fight because we believe in the jury system." After a little more argument about how appellants' "cherrypicked certain depo clips and want to fool you," appellants objected and claimed that appellees' counsel was "misrepresenting that I am misrepresenting the evidence." The trial court overruled the objection but told appellees' counsel, "[M]y bigger issue is that you interjected the fact that she was African-American and she's a woman; and I didn't hear anything on the other side referring to that as a basis for denying them recovery." The court asked counsel to limit his argument to the admitted evidence. Then, appellants moved for a mistrial "based upon the racial bias" identified by the trial court. The court overruled the motion. Appellants did not request a retraction of counsel's statement or an instruction to disregard.

Viewed in context of the discussion during voir dire about juries awarding smaller damage awards to women, we agree with appellees that their argument was not a suggestion that appellants were racist or sexist, but a request of the jurors to not let implicit racial or gender bias impact their deliberations. It was not an "appeal to racial prejudice in language clear and strong," but rather an appeal to impartiality. *See Tex. Empl. Ins. Ass'n v. Haywood*, 153 Tex. 242, 245 (1954) (incurable argument that witnesses shouldn't have been believed because of their race); *see also TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 245 (Tex. 2010) (harmful error when counsel repeatedly called attention to a driver's status as an illegal immigrant; "Such

appeals to racial and ethnic prejudices, whether explicit and brazen or veiled and subtle, cannot be tolerated because they undermine the very basis of our judicial process."). To the extent there was confusion about counsel's meaning of the brief and isolated statement during closing argument, it could have been cured with a retraction or instruction to disregard. We overrule appellants' third issue.

### 3. *"Irrelevant Facts and Personal Attacks"*

In their fourth issue, appellants contend that appellees' counsel's closing arguments injected irrelevant facts and personal attacks on appellants. In particular, appellants complain about counsel's arguments that appellants (1) wanted a "discount" on damages; and (2) would not pay the verdict awarded by the jury because the trial was "just the beginning of a long legal battle."

During closing arguments, appellees' counsel used the word "discount" to apparently suggest that appellants did not want to adequately compensate John for her damages:

> [Appellees' Counsel]: But I represent to you in 2019, the pain and suffering and mental anguish of what she's experienced and is about to experience is worth 10 to 12 million dollars; and I ask you to consider it. When I sit down, they're going to get up there and talk about how, number one, she doesn't have it; and, number two, if you do award money, award like 4 or 5 million dollars. You might as well award zero, because that's the cost of doing business for them. Partial justice is no justice. They just want a discount.
>
> *****
>
> Because it's lawyer talk. And I understand that. I respect that. I respect what they have to do. Because they want a discount, and I don't think you have to discount a human being's life. And I ask you to award full damages.

Counsel also suggested that appellants would not pay the jury's verdict:

[Appellees' Counsel]: And so, we ask you, as the Harris County jurors, to judge her today and in the future and award full compensation. His Honor—His Honor will take care of the rest.

All we're trying to do is move the money from here (indicating) to here (indicating). Do you think—do you think they're going to pay your verdict like that (indicating)? This is just the beginning of a long legal battle. Just the beginning.

[Appellants' Counsel]: Your Honor, I object. This is improper in closing argument.

The Court: We can move on, Counselor.

Appellants contend that these statements strike at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts. *See Penalver*, 256 S.W.3d at 681.

Counsel's statements regarding the "discount" on damages were mere hyperbole and based on the facts and issues raised by the evidence—that is, appellants believed the amount of their damages was $10 to $12 million while appellees believed the amount of damages was less. *Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 677–78 (Tex. App.—Dallas 2018, pet. granted, aff'd as modified) (no incurable argument in case involving falling box in store when counsel used the term "Walmart treatment," referred to the opposing party's witness as a "hit man," and characterized the plaintiff as a "victim"). "Hyperbole has long been one of the figurative techniques of oral advocacy. Such arguments are a part of our legal heritage and language." *Reese*, 584 S.W.2d at 836, 838 (Tex. 1979) (mere hyperbole that the plaintiff "drove by a thousand doctors between the Astrodome and Spring Branch"). The argument was not improper; but even if improper, it was not incurably so. *See Bishop*, 553 S.W.3d at 677–78; *see also Reese*, 584 S.W.3d at 836, 840–41 (no incurable argument when counsel argued that the plaintiff sought out doctors who would "build those medical bills up real high" because it would "look good in front of a jury," and "Does not a sham or a plot evolve out of all of this?").

Assuming for the sake of argument that counsel's suggestion that appellants would not pay the jury's verdict without a "long battle" was improper, it was not the type of argument that has been held incurable. *Compare Circle Y of Yoakum v. Blevins*, 826 S.W.2d 753, 759 (Tex. App.—Texarkana 1992, writ denied) (incurable argument claiming that defense counsel manufactured evidence), *and In re Munsch*, 614 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2020, orig. proceeding) ("The use of epithets such as 'liar,' 'fraud,' 'faker,' 'cheat,' and 'imposter' are recognized as incurable."), *with Metro Transit Auth. v. McChristian*, 449 S.W.3d 846, 855–56 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (no incurable argument by referring to opposing counsel's argument with question, "What kind of snake oil is he selling you?"). Counsel's argument was not an unsubstantiated attack on the integrity or veracity of a party or counsel, but rather, it was derived from the ordinary course of proceedings in many cases when, as here, a defendant appeals and supersedes the judgment. *See* Tex. R. App. 24.1. Retraction of the argument or an instruction to disregard could have cured any probable harm. We overrule appellant's fourth issue.

### 4. Attorney's Fees

In their fifth issue, appellants contend that appellees' counsel improperly "referenced attorneys' fees as part of the damages, or as something the jurors could (and should) consider in determining the amount of any damage awards."

During voir dire, a venireperson asked appellees' counsel, "But are—y'all have a contingency on the amount awarded that the lawyers get?" Counsel answered, "Yes. . . . And I rise and fall with—if I lose, I get zero." Appellants moved for a mistrial, contending that counsel tainted the jury, and the potential jurors would want to award more money knowing that part of the recovery would go to the lawyers. The trial court denied the motion.

Later during voir dire, another venireperson asked about attorney's fees: "If you win, how much money are you going to make?" Before counsel could answer, the court gave a lengthy instruction to the venire, in relevant part:

> So, the only thing you're—I'm not going to ask you any questions about attorney's fees. . . . You're not going to be asked to consider anything about attorney's fees in this case. I'm going to ask you—like I said before, I don't—I'm going to ask you some questions; and I'm going to ask you to answer those fact questions, usually about who—what happened, who caused it, and what the damages are. And you're going to have to come to a reasonable amount based on the evidence about what the appropriate answers are in concert with all the other jurors.
>
> You should only be guided by the evidence admitted in this court. If you're considering other things other than the evidence in court, then we should know that because it wouldn't be fair to the people in trial, I mean, here today—either party. And so, that's the purpose of asking these questions.

Later during the same day, appellants again moved for a mistrial, which the trial court denied. The court told appellants they were entitled to examine the venire on the issue of attorney's fees to discover any bias or prejudice. Appellants did not do so.

During closing argument, appellees' counsel said, "But in our legal system you equate pain and suffering and mental anguish with dollars, with money. And I know people get cynical. How much are the lawyers going to make? You know, this is just a free for all. I get that. I have heard it all." About ten minutes later, appellants moved for a mistrial. The court denied the motion, explaining, "The Court provides instructions that they're not to consider attorney fees. I don't think that he asked them to consider attorney's fees. I think you said not to consider it, although I know the context was a little bit different."

Appellants cite no analogous case to support their argument on appeal, and we have found none. A review of the whole record, including voir dire and closing

arguments, does not support appellants' argument that appellees' counsel's responses to venirepersons' questions or his rhetorical question during closing arguments—"How much are the lawyer's going to make?"—amounted to an invitation to the jury to consider attorney's fees as part of damages. The trial court understood the argument as one to *not* consider fees, i.e., counsel asked the jury to not be "cynical" and consider fees when determining how much to compensate appellees for their injuries. The topic had been raised during voir dire because venirepersons asked, unprompted, about fees. The trial court instructed the venire that they would not consider fees, allowed appellees' counsel to conduct voir dire on the topic, and expressed the intention during closing argument to inform the jury again that they should not consider fees when assessing damages.

Under these circumstances, we cannot conclude that the "casual and incidental reference" to attorney's fees during closing argument rises to the rare level of incurable argument that probably caused an improper judgment. *See Isern v. Watson*, 942 S.W.2d 186, 199 (Tex. App.—Beaumont 1997, writ denied) (no incurable error when the plaintiff's counsel referenced insurance during closing argument); *see also Univ. of Tex. at Austin v. Hinton*, 822 S.W.2d 197, 200–01 (Tex. App.—Austin 1991, no writ) (no incurable error during voir dire when the plaintiff's counsel said, in response to questions and concerns from venirepersons, that the plaintiff had insurance at the time of the accident but would be required to repay the insurance company for amounts recovered from the defendant); *St. Louis. Sw. Ry. Co. v. Gregory*, 387 S.W.2d 27, 33 (Tex. 1965) (no incurable error during voir dire when the defendant's counsel said, "There is no insurance here," as a spontaneous reaction to the venireperson's answer, even if the statement was interpreted by venirepersons that the defendant did not have liability insurance). We overrule appellants' fifth issue.

## C.  Cumulative Error

As part of their issues regarding appellees' counsel's allegedly improper arguments, appellants contend that the statements cumulatively, if not singularly, warrant a new trial.

In cases involving improper arguments, we consider the cumulative effect of all the statements to determine if they are so prejudicial that they are incurable. *See S. Pac. Co. v. Hubbard*, 156 Tex. 525, 532 (Tex. 1956). The only potentially erroneous arguments—implying that appellants would challenge the jury's verdict and referring to attorney's fees—were mild, brief, and isolated. Appellants' authorities involved more frequent and prejudicial comments. *Cf., e.g.*, *Nat'l Union Fire. Ins. Co. of Pittsburgh, Penn. v. Kwiatkowski*, 915 S.W.2d 662, 665 (Tex. App.—Houston [14th Dist.] 1996, no writ) (harmful error from many comments about irrelevant and unsubstantiated bad behavior, such as intimidating witnesses, occurring during one-day trial). Although the jury awarded damages consistent with appellees' request, the jury also rejected appellees' request to find New Prime grossly negligent and award punitive damages. Considering the whole record, the state of the evidence, the strengths and weaknesses of the case, and the verdict, we conclude that the jury "carefully considered its verdict and the evidence." *See Reese*, 584 S.W.2d at 841.

Appellees' counsel's statements, considered cumulatively, do not warrant a new trial.

## III.  NEGLIGENT ENTRUSTMENT

In their twelfth issue, appellants contend that the evidence is legally insufficient to support the jury's finding of negligent entrustment and that the trial court erred by admitting evidence of Alonzo's driving record.

## A.      Sufficiency Challenge

Appellants contend that the evidence is legally insufficient to support the jury's affirmative answer to a question about New Prime's liability for negligent entrustment. New Prime, however, stipulated to its vicarious liability for Alonzo's negligence.[7] The jury did not find New Prime grossly negligent and did not award punitive damages. Thus, the trial court's judgment is fully supported by the stipulated vicarious liability theory, independent of the negligent-entrustment finding. Under these circumstances, we do not address the sufficiency of the evidence to support the negligent-entrustment finding. *See Townley v. Lanier*, No. 14-19-00447-CV, 2021 WL 2325082, at *4 (Tex. App.—Houston [14th Dist.] June 8, 2021, pet. filed) (mem. op.) ("If we conclude that the judgment may be upheld on either one of the independent theories of recovery, we need not address any alleged error pertaining to the other claim.") (citing *Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980); *see also White v. Zhou Pei*, 452 S.W.3d 527, 541 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

## B.      Evidentiary Matters

Appellants contend that the trial court erred by admitting evidence of (1) Alonzo's traffic collisions and citations that occurred more than six years before the accident in this case and (2) irrelevant accidents and citations related to, among other things, administrative violations, parking tickets, minor parking lot and loading dock collisions, collisions related to wildlife, and collisions caused by others. Appellants

---

[7] The negligent-entrustment question was submitted to support appellees' claim of gross negligence to justify an award of punitive damages. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) ("A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence.").

contend, without substantive analysis, that the evidence "clearly impacted the damages awarded in this case and caused the rendition of an improper judgment."

The erroneous admission of evidence requires reversal only if the error probably, though not necessarily, resulted in an improper judgment. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). We will consider the entire record, but the complaining party must demonstrate that "the judgment turns on the particular evidence admitted." *Id.* The erroneous admission of evidence is harmless if it is merely cumulative. *Id.*; *see also Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) ("This court ordinarily will not reverse a judgment for erroneous ruling on admissibility of evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case."). "But beyond that, whether erroneous admission is harmful is more a matter of judgment than precise measurement." *Armstrong*, 145 S.W.3d at 144.

Assuming without deciding that the evidence was inadmissible, we begin the harm analysis by reviewing the jury's verdict. *See Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). Although the jury could have used this evidence to find that New Prime negligently entrusted the vehicle to Alonzo, the jury did *not* subsequently find that New Prime was grossly negligent. New Prime admitted to liability, as discussed above, so the jury's finding about negligent entrustment was immaterial to the trial court's judgment because the jury's answer could not alter the effect of the verdict. *Cf. City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) (improper submission of issue is generally harmless if jury's answer cannot alter the effect of the verdict).

Although one of appellees' lawyers referred to this evidence when urging the jury to find New Prime negligent, another of appellee's lawyers who addressed John's pain and suffering and mental anguish did not discuss Alonzo's driving

history. That is, no connection was made between Alonzo's driving history and appellees' damages.

Finally, the complained-of evidence was not particularly prejudicial: some old speeding tickets, more recent non-vehicular collisions, logging discrepancies, and the like. In light of the significant evidence of appellees' pain and suffering and mental anguish, discussed above, we cannot conclude that the judgment turns on the evidence of Alonzo's driving history. *Cf. Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (2008) (evidence that the defendant had $1.9 billion in sales carried "a very real potential for prejudice" in a case where the defendant admitted liability and the "biggest issue" concerned damages (quotation omitted)).

Admission of this evidence did not probably result in the rendition of an improper judgment. We overrule appellants' twelfth issue.

## IV. CONCLUSION

Having overruled each of appellants' issues we affirm the trial court's judgment.

/s/    Jerry Zimmerer
       Justice

Panel consists of Justices Wise, Bourliot, and Zimmerer (Wise, J., dissenting).